UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTINA LEAL,

 Plaintiff,

 v.                Case No. 19-CV-1356-SCD

ANDREW M. SAUL,
**Commissioner of Social Security,**

 Defendant.

## DECISION AND ORDER

 Christina Leal applied for Social Security benefits in 2016, alleging that she is disabled based on chronic neck and back pain. Following a hearing, an administrative law judge (ALJ) denied benefits in 2018, finding that Leal remained capable of working notwithstanding her impairments. Leal now seeks judicial review of that decision, arguing that the ALJ erred in evaluating her alleged symptoms and weighing the medical opinion evidence. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree with the Commissioner. Accordingly, his decision will be affirmed.

## BACKGROUND

 Leal was born on November 30, 1961. R. 35.[1] After obtaining her high school equivalency degree, she worked in various unskilled positions, primarily as a machine operator and an assembler. *See* R. 41, 56, 323, 366–73. In August 2014, Leal began

---

[1] The transcript is filed on the docket at ECF No. 12-2 to ECF No. 12-23.

experiencing neck pain with neck muscle spasms. R. 620. Her pain worsened despite physical therapy, and she also developed pain in her back and upper extremities. R. 524, 611, 815. A CT scan in January 2015 revealed mild degenerative changes in her cervical spine. R. 571–72.

In early 2016, Leal applied for disability insurance benefits and supplemental security income from the Social Security Administration (SSA), alleging that she became disabled on December 30, 2015 (when she was fifty-four years old). R. 279–86. Leal asserted that she was unable to work due to chronic neck pain, cervical radiculopathy, neck and muscle spasms, and paresthesia (i.e., pins and needles in her upper extremities). R. 321. After her applications were denied at the local level, *see* R. 126–93, Leal requested an administrative hearing before an ALJ. *See* R. 224–25. Leal, along with her attorney, appeared before ALJ Jeffry Gauthier on June 22, 2018. R. 28–125. At the time of the hearing, Leal was fifty-six years old. R. 36. She was living in Racine, Wisconsin, with her eighteen-year-old daughter and working about twelve hours per week as a cashier at Piggly Wiggly. R. 36, 38–39.

Leal testified that she became disabled on December 30, 2015, due to degenerative disc disease that caused chronic pain in her neck that radiated down her back and into both arms, though mainly the right one. R. 42, 65, 71–72, 102. She was still working at the time but claimed she couldn't work as fast as she used to. R. 42, 70–71. She also had difficulty lifting things and climbing stairs. R. 70, 99. Leal indicated that her pain persisted notwithstanding physical therapy, epidural steroid injections, and pain medications. R. 65–67. She estimated that her medications worked only fifty percent of the time, decreasing her level of pain but not providing complete resolution of her symptoms. R. 68–69. When asked about her daily activities, Leal testified that she exercised one to two hours each day, including walking thirty to thirty-five minutes each morning and afternoon. R. 83–84. She estimated that she was

walking about one mile per day at the time of the hearing, which was down from three or four miles. *See* R. 85, 87, 104–07. Leal testified that, in 2017—that is, after her alleged onset date—she received unemployment insurance benefits. R. 96. To obtain these benefits, she represented to state authorities that she was "ready, willing, and able to work." *See* R. 50–56.

The ALJ also heard testimony from Elizabeth Pasikowski, an impartial vocational expert. Pasikowski testified that Leal had three past relevant jobs: a bench assembler, a cleaner, and a production assembler. R. 62–64. According to Pasikowski, a hypothetical person with Leal's age, education, and work experience could still perform the assembler jobs—but not the cleaner one—if she were limited to a restricted range of light work R. 115–17. That person could also perform other jobs, including, for example, as an information clerk. R. 117.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), on November 6, 2018, the ALJ issued a written decision concluding that Leal was not disabled. *See* R. 10–27. The ALJ determined that Leal had not engaged in substantial gainful activity since December 30, 2015, her alleged onset date. R. 15. The ALJ found that Leal's physical impairment, degenerative disc disease of the cervical and lumbar spine, limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 15–16. The ALJ next determined that Leal had the residual functional capacity (RFC) to perform light work with the following additional limitations:

- She can never climb ladders, ropes, or scaffolds;
- She can occasionally climb ramps or stairs;
- She can occasionally stoop, kneel, crouch, and crawl;
- She can frequently handle and finger with her right upper extremity;
- She can occasionally reach overhead with her upper extremities; and

3

- She can never work at unprotected heights or around moving mechanical parts

R. 16. In assessing her RFC, the ALJ determined that Leal's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 17. As for the medical opinion evidence, the ALJ gave "little weight" to the opinion of Leal's treating neurosurgeon, Ofer Zikel, MD; "some weight" to the opinions of Leal's occupational therapist, Ruth Meehan, OTR; and "great weight" to the opinions of the non-examining state-agency medical consultants. R. 19. The ALJ determined that, in light of the above RFC, Leal could perform her past job as an assembler and could also work as an information clerk; therefore, she was not disabled. R. 20–21.

After the SSA's Appeals Council denied review, *see* R. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Leal filed this action on September 17, 2019. ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 20, 22. The matter is fully briefed and ready for disposition. *See* ECF Nos. 16, 21, 23.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

4

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing

5

*Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Leal contends the ALJ erred in evaluating the intensity, persistence, and limiting effects of her alleged symptoms and weighing the medical opinion evidence.

## I. The ALJ's Evaluation of Leal's Alleged Symptoms

Leal first argues that the ALJ failed to comply with requirements of Social Security Ruling (SSR) 16-3p when evaluating her alleged symptoms. *See* ECF No. 16 at 14–20.

SSR 16-3p mandates a two-step process for evaluating a claimant's impairment-related symptoms. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the

6

intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10. The ALJ also uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *See id.* at *18–19 (listing seven factors).

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Leal identifies several alleged errors in the ALJ's subjective-symptom analysis. She first criticizes the ALJ for relying on the following "meaningless" boilerplate paragraph:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

*See* ECF No. 16 at 16 (quoting R. 17). However, as the Seventh Circuit has explained, "[t]he use of boilerplate is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (citing *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)). That's exactly what happened here. Immediately after the boilerplate paragraph,

7

the ALJ explained that Leal's "statements about the intensity, persistence, and limiting effects of . . . her symptoms" were inconsistent with her stable functioning with treatment and "consistent with the ability to perform light work." R. 17. The ALJ acknowledged that, while at times Leal had limited range of motion and tenderness in her cervical spine, more often than not her physical examinations revealed a normal gait and station, intact cranial nerves, symmetric reflexes, full strength in her upper extremities, and full neck range of motion. *See* R. 17–18. The ALJ also discussed imaging studies, which revealed at most "mild" findings, and Leal's own reports that epidural steroid injections provided "moderate improvement in her pain" and that her pain was "tolerable" and "stable" with pain medications. *See id.* Finally, the ALJ noted Leal's daily activities, including working up to twenty-five hours per week and walking four miles per day on a regular basis. R. 18. The ALJ's use of boilerplate therefore was not problematic, as he provided a thorough explanation, grounded in the record, for not fully crediting Leal's alleged symptoms; the required bridge was not lacking.

Leal next accuses the ALJ of not identifying which of her statements were considered, what weight was given to each statement, and why. *See* ECF No. 16 at 15, 17. This alleged error was material, according to Leal, because she presented statements that would preclude sustained work on a regular and continuing basis. *Id.* at 17. Leal does not cite any authority to support this argument. That's likely because the law is not on her side: ALJs are not required to discuss each of the claimant's individual statements. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012) (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir 2003); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)) ("[A]n ALJ's credibility findings need not specify which statements were not credible."); *see also Lemerande v. Berryhill*, Case No. 17-C-190, 2018 U.S. Dist. LEXIS 30303, at *10 (E.D. Wis. Feb. 26, 2018) ("An ALJ is not a polygraph

8

machine that assesses each statement individually. That kind of detail is neither required nor necessary for judicial review.").

Relying on *Pope v. Shalala*, 998 F. 2d 473 (7th Cir. 1993), Leal next contends that she didn't need to support the limiting effects of her alleged symptoms with objective evidence; thus, the ALJ's reliance on medical evidence—such as physical exams, radiology reports, and objective medical findings—was not sufficient. *See* ECF No. 16 at 17–19. *Pope* stands for a simple principle: an ALJ cannot reject a claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms "simply because the objective medical evidence may not support the extent of pain claimed. . . . Instead, [the ALJ] must evaluate all of the evidence, including medical evidence." *Pope*, 998 F.2d at 486. The ALJ here did not violate this rule. As explained above, the ALJ determined that, in addition to the objective medical evidence, Leal's alleged symptoms were not consistent with her reported improvement and stability with treatment and her daily activities. Thus, Leal's reliance on *Pope* (and like cases) is misplaced.

Leal also maintains that, by concluding that she could perform light work and then citing "some office notes in support of that conclusion," "[t]he ALJ turn[ed] the symptom evaluation on its head." *See* ECF No. 16 at 19. Her argument is underdeveloped and difficult to follow. To the extent she is preoccupied with the format of the ALJ's decision, that concern is unfounded, as there is no requirement that the written decision must include the subjective-symptom evaluation *before* the ALJ's description of the RFC. Moreover, the ALJ here did not reject Leal's alleged symptoms because they were inconsistent with her RFC; that would impermissibly put the cart before the horse. *See Filus*, 694 F.3d at 868. Rather, the ALJ determined that Leal's statements suggested that she was capable of a restricted range of light

9

work. *See* R. 17. And the ALJ offered more than just office notes to support that finding. *See* R. 16–18.

Next, Leal asserts that "the record does not demonstrate that [her] functioning has remained stable with treatment." *See* ECF No. 16 at 19. She claims that, if her functioning was stable, then she would have not undergone three cervical spine MRIs, two courses of physical therapy, and multiple cervical epidural steroid injections and had discussions about possible surgery; also, she would not have been diagnosed with severe intractable cervical radiculopathy. Leal's argument rests on a misreading of the ALJ's decision. In concluding that Leal's functioning remained stable with treatment, the ALJ accurately noted several instances when Leal reported improvement with treatment (including steroid injections) or stability in symptoms with medication. *See* R. 17 (citing Exhibit 4F/2–3 [R. 750–51], 4F/3–4 [R. 751–52]). The ALJ never suggested that her *treatment* was stable or that treatment completely resolved her symptoms; in fact, the ALJ described Leal's different treatment modalities and noted times when she reported worsening symptoms. *See* R. 17–18. Leal essentially asks that I reweigh this evidence and substitute my own opinion for that of the ALJ. However, I am not entitled to do so. *See Skarbek*, 390 F.3d at 503 (citing *Lopez*, 336 F.3d at 539).

Leal next accuses the ALJ of conducting the administrative hearing in an adversarial manner. *See* ECF No. 16 at 20. Specifically, she claims "the ALJ badgered [her] about filing for unemployment compensation benefits and claiming that she misrepresented herself for purposes of getting those benefits." *Id.* Though the transcript at times supports Leal's suggestion that the ALJ was condescending to her, Leal has not demonstrated that the hearing was actually adversarial. Crucially, the ALJ did not mention Leal's applying for

10

unemployment benefits anywhere in his written decision; thus, there's no reason to believe that fact played a role in discrediting Leal's alleged symptoms. Even if he had cited that fact, that would not necessarily be error, as the Seventh Circuit has determined that ALJs can consider the apparent discrepancy between collecting unemployment benefits and claiming an inability to work when assessing a claimant's subjective complaints of disability. *See, e.g., Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)("we are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely no role in assessing his subjective complaints of disability.") Leal indicates that "[t]his is just one of many examples during the hearing of the ALJ treating the proceedings as an adversarial process." ECF No. 16 at 20. However, she provides no additional examples, and I will not go searching for them.

Finally, Leal faults the ALJ for not discussing instances in her function report and hearing testimony where she described difficulties performing activities of daily living. *See* ECF No. 16 at 20. But Leal does not identify any difficulties or limitations the ALJ failed to mention or attempt to explain what effect these alleged omissions had on his decision. Thus, she has waived this argument. *See Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (quoting *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998)) ("We have held time and again that perfunctory and undeveloped arguments (even constitutional ones) are waived.").

In sum, Leal has failed to demonstrate that the ALJ's evaluation of the intensity, persistence, and limiting effects of her alleged symptoms was patently wrong.

## II. The ALJ's Evaluation of the Medical Opinion Evidence

Leal next argues that the ALJ erred in weighing the opinions of her treating neurosurgeon, Dr. Zikel, and occupational therapist, Ruth Meehan. *See* ECF No. 16 at 7–14.

### A. Dr. Zikel

Leal maintains that the ALJ should have given controlling weight to Dr. Zikel's opinions and that the reasons the ALJ gave for discounting his opinions are flawed. *See* ECF No. 16 at 9–12.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* §§ 404.1527(c), 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Only "the most patently erroneous reasons for discounting a treating physician's assessment" require reversal. *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

Dr. Zikel began treating Leal in 2015 and diagnosed her with cervical radiculopathy. *See* R. 110, 643–45. On May 5, 2017, Dr. Zikel wrote a letter indicating that Leal could work a maximum of twenty to twenty-five hours per week, could lift no more than twenty to twenty-five pounds, and needed to switch positions every thirty minutes. R. 1151. Exactly one year later, Dr. Zikel wrote a letter indicating that he had been Leal's treating neurosurgeon for a number of years and that Leal's severe intractable cervical radiculopathy had progressed since his last letter. *See* R. 1161–62. The May 2018 letter included the following updated work restrictions:

> She had previously worked up to 25 hours which was difficult for her to handle. It is my opinion that she should be limited to 10 – 15 hours per week. She would be limited to lifting no more than 10 lbs. She would need to take breaks for five to ten minutes after every 30 – 45 minutes. If she had to work full time, which in my opinion she cannot do, then she would be absent from work 2 or more times per month.

R. 1161.

Despite noting that Dr. Zikel was a specialist who had an ongoing treatment relationship with Leal, the ALJ assigned his opinions little weight. R. 19. The ALJ noted that Dr. Zikel's opinions were not supported by any objective findings. According to the ALJ, the objective medical evidence that was in the record included mild MRI and normal EMG findings that did not support Dr. Zikel's opined limitations. Similarly, the ALJ determined that Dr. Zikel's "physical exam findings . . . do not document diminished strength that would warrant such extreme lifting limitations, and [Leal's] ability to walk four miles per day is consistent with the ability to maintain a full-time work schedule." *Id.* The ALJ also referenced Leal's treatment notes, which in his view showed her "condition to be stable, with no significant change in physical examination or imaging findings with good, if temporary, responses to epidural steroid injections." *Id.* According to the ALJ, these treatment notes did

not support Leal's alleged reduction in work capacity, and Dr. Zikel did not offer any explanation for the increased work restrictions. Finally, the ALJ believed that Dr. Zikel's opinions were based on Leal's "own request to correspond to the hours she actually worked rather than independently determined limitations." *Id.* (citing Exhibit 12F/44 [R. 1046]).

Leal identifies six alleged errors in the ALJ's weighing of Dr. Zikel's opinions. First, she contends that "[t]he nature of the treating relationship and the fact that Dr. Zikel is a specialist as a neurosurgeon are important factors in considering whether to a give a treating source opinion controlling weight." *See* ECF No. 16 at 9–10. That's true. *See* §§ 404.1527(c)(2) & (5), 416.927(c)(2) & (5). But the ALJ explicitly noted that Dr. Zikel is a specialist who had an ongoing treatment relationship with Leal, *see* R. 19, and Leal has not demonstrated that the ALJ merely paid lip service to these factors.

Second, Leal takes issue with the ALJ's characterization of Dr. Zikel's ten-pound lifting restriction as "extreme." *See* ECF No. 16 at 10. I see no error in the ALJ's use of that adjective. Regardless of how he characterized the lifting restriction, the ALJ reasonably determined that Leal's physical exams, which consistently document normal strength, *see* R. 680, 751, 1138, did not support limiting her to lifting no more than ten pounds.

Third, Leal takes issue with the ALJ's conclusion that Dr. Zikel appeared to change his work restrictions based on Leal's request. *See* ECF No. 16 at 10. I agree. The exhibit cited by the ALJ, 12F/44, corresponds to Dr. Zikel's May 2017 work-restriction letter, not the updated letter from May 2018. *See* R. 1046. Thus, that exhibit lends no support to the ALJ's supposition that Leal asked Dr. Zikel to have her work restrictions mirror the hours she was actually working. Ultimately, however, the ALJ's mistake was harmless. In addition to Exhibit 12F/44, the ALJ determined that treatment notes from May 2017 to May 2018 did not

14

support the opined reduction in Leal's capacity, as there was no significant change in the physical exam or imaging findings, and Leal reported some relief from epidural steroid injections during that period. *See* R. 19. In other words, Dr. Zikel's statement that Leal's condition had progressed was not supported by the objective medical evidence. Without any further explanation from Dr. Zikel, the ALJ reasonably inferred that his updated opinion, which reduced Leal's maximum workweek from twenty to twenty-five hours to ten to fifteen hours, was too heavily influenced by Leal's subjective report that she was working ten to fifteen hours at the time. *See* §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Indeed, the May 2018 letter acknowledged that Leal "had previously worked up to 25 hours which was difficult for her to handle," R. 1161, and Leal agreed at the hearing that Dr. Zikel "to some extent . . . formulated his opinion based upon [her] reporting of how work was going," *see* R. 79–80.

Fourth, Leal challenges the ALJ's reliance on her reported ability to walk long distances. *See* ECF No. 16 at 10–11. She suggests that the ALJ impermissibly equated her walking with an ability to work full-time. I disagree. During an April 23, 2018 doctor's visit, Leal stated that she was "an avid walker and has been walking for many years 4 miles a day." R. 1144. The ALJ referenced this claim when weighing Dr. Zikel's opinions, stating that Leal's "ability to walk four miles per day is consistent with the ability to maintain a full-time schedule." R. 19. In context, it appears the ALJ cited Leal's own statement about her ability to walk as inconsistent with Dr. Zikel's opinion that Leal could work only ten to fifteen hours per week. This was a reasonable conclusion based on the evidence. At a moderate pace, walking four miles takes one hour and twenty minutes. Over the course of a week, that would

15

amount to more than nine hours of walking. It is reasonable to conclude that someone who could ambulate for nine hours engaging in a hobby or avocation—that is, purely optional, volitional activity—could perform gainful employment for more than ten to fifteen hours. Leal also maintains that the ALJ ignored evidence in the record that reflected a more limited ability to walk, including her function report and her hearing testimony. *See* ECF No. 16 at 10–11 (citing R. 87, 107, 380). But it's difficult to see how that evidence (from June 2016 and June 2018, respectively) could have been more probative than Leal's own report to her doctor, which she made less than two weeks before Dr. Zikel authored the May 2018 letter.

Fifth, Leal asserts that the ALJ erred in concluding that Dr. Zikel's opinions were not supported by any objective findings. *See* ECF No. 16 at 11. It appears Leal's argument is based on a misreading of the ALJ's decision. The ALJ didn't claim that there was no evidence whatsoever in the record consistent with Dr. Zikel's opinions. Rather, the ALJ correctly concluded that Dr. Zikel did not identify any objective support *within his opinions*. Lack of support is a permissible factor for the ALJ to consider when weighing medical opinion evidence. *See* §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Finally, and relatedly, Leal offers several examples of objective findings that purportedly support Dr. Zikel's opinions, including limited neck range of motion, tenderness, diminished sensation, and degenerative changes in her cervical spine. *See* ECF No. 16 at 11–12. But, as Leal acknowledges, the ALJ expressly considered this evidence and found that it did not support the degree of limitation opined by Dr. Zikel. *See* R. 17–19. Put another way, in the ALJ's view, the minor clinical abnormalities were outweighed by other objective

16

findings showing normal gait, intact cranial nerves, symmetric reflexes, full strength in the upper extremities, and full range of neck motion. That finding is supported by substantial evidence in the record. *See Scheck*, 357 F.3d at 699 (citation omitted) ("[T]he ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence.").

Because the ALJ reasonably determined that Dr. Zikel's opinions were not well-supported by or consistent with the record evidence, they were not entitled to controlling weight. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight."). Moreover, the ALJ provided specific reasons, consistent with the regulatory factors, for why he ultimately gave those opinions little weight.

### B. Meehan

In October 2017, an advanced practice nurse prescriber working with Dr. Zikel referred Leal for a functional capacity exam that would support her disability application. *See* R. 1058. "A Functional Capacity Evaluation (FCE) is a systematic process using standardized examination procedures to analyze an individual's current medical status[] and abilities and willingness to perform functional tasks associated with activities of daily living and work." *See* R. 914. Ruth Meehan, an occupational therapist, performed the FCE on December 21, 2017, and compiled a report documenting her findings. *See* R. 914–23. Based on the results of the FCE, Meehan opined that Leal was capable of light work. R. 922. She explained,

> From a physical perspective she demonstrated mildly reduced cervical [active range of motion] with pain at end range of [right] side bending as noted on page 3. She had pain with palpation rated at 5/10 in central location of C7 spinous process and medial border of scapula at rhomboids. She reported a history of occasional changes in sensation in [right] arm if seated too long and did not experience this at time of eval.

17

> From a functional perspective she exerted force up to and within a light category of work. Pain was progressive in nature up to a 7/10 with reports in rhomboids. She also experienced intermittent increase of neurological symptoms with exertional activity, especially when reaching above shoulder level or exerting force greater than 20 [pounds]. Sensory changes in [right] arm were located in ulnar n[erve] distribution from elbow to hand including digits 4 and 5.
> She reported previously assigned permanent restrictions from Dr. Zikel as a 25 [pound] maximum, and maximum weekly hours of work as 25. She demonstrated exertional ability this date which appears consistent with that.

*Id.*

The ALJ assigned some weight to Meehan's opinions. R. 19. The ALJ credited Meehan's limitation to light work, finding it "well-supported by the objective testing she administered." *Id.* However, the ALJ determined that "the limitations regarding position changes and working no more than 25 hours per week were based on [Leal's] own reports of Dr. Zikel's limitations, rather than on Ms. Meeban's (sic) own objective findings." *Id.* And according to the ALJ, the limitations from Dr. Zikel were "not consistent with the record." *Id.*

Leal argues that the ALJ's rejection of Meehan's limitations regarding position changes and maximum workweek hours is not supported by substantial evidence. *See* ECF No. 16 at 13–14. I disagree. Although Meehan indicated that Leal demonstrated exertional ability during the exam that appeared consistent with Dr. Zikel's opined limitations, she never explained which aspect of her testing supported those very specific limitations. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Moreover, even if the ALJ erred in inferring that these limitations were based on Leal's subjective report of Dr. Zikel's opinions, the ALJ reasonably determined that Dr. Zikel's opined limitations were not consistent with the record. *See* supra s. II.A. Thus, the same reasons justified the ALJ not crediting Meehan's statement about Dr. Zikel's opined limitations.

18

## CONCLUSION

For all the foregoing reasons, I find that the ALJ did not commit reversible error in evaluating Leal's alleged symptoms or weighing the opinions of her treating neurosurgeon or occupational therapist. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 6th day of August, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge